# Wells *v.* Sheerer.

*Statutory Action in nature of Ejectment.*

1. *Writing construed as in nature of lease.*—A writing under seal, attested and recorded, in these words: "Know all men by these presents, that I do put into the hands of A. J. W., as collateral security for my board with him for the last three years and a half, my house and lot in the town of M.; and he is further authorized to control and receive the rents and profits, if there be any, until the war is over, and some of her children comes and sees to the payment of the above board, unless it should be sooner paid. If the said A. J. W. should receive

[Wells v. Sheerer.]

any rents or profits for the house and lot, he is to give me credit with the amount on my account with him for board; and he will also give me credit with the amount of sale-bill bought at Mrs. W.'s sale, amounting to $672"—operates in the nature of a lease, and is so regarded in this case.

2. *Estoppel and adverse possession, as between landlord and tenant.* While a tenant is estopped from denying the title of his landlord, so long as the relation exists and is recognized between them, he may repudiate the relation, and set up an adverse claim and possession in himself, which may ripen into a title under the statute of limitations; but such hostile claim on his part operates a forfeiture of the lease, at the election of the landlord, who may at once eject him as a trespasser.

3. *Adverse possession, as between landlord and tenant.*—When the tenant sets up adverse possession in himself, in defense of an action by the landlord under whom he entered, knowledge of such adverse holding must be brought home to the landlord, or notice of collateral facts from which such knowledge will be inferred.

APPEAL from the Circuit Court of Shelby.

Tried before the Hon. S. H. SPROTT.

This action was brought by Mrs. Eliza G. Sheerer against Mrs. Sarah Wells and others, to recover the possession of a house and lot in Montevallo; and was commenced on the 10th April, 1883. The cause was tried on issue joined on the plea of not guilty, the court having sustained a demurrer to a special plea, which alleged the execution by Mrs. Watrous (plaintiff's mother) of the writing hereinafter set out, and that the debt therein mentioned was still unpaid and unsatisfied. The plaintiff was the only child of Mrs. Maria Watrous, who died in Texas, in August, 1880; and the defendants were the widow and children of A. J. Wells, deceased, who also died during the year 1880. The plaintiff proved, by French Nabors, that Mrs. Watrous was in possession of the house and lot from the year 1846 to 1865, when she executed and delivered to said A. J. Wells a writing, which he (said witness) wrote and attested, and which was in these words: "Know all men by these presents, that I do put into the hands of A. J. Wells, as collateral security for my board with him for the last three years and a half, my house and lot in the town of Montevallo; and he is further authorized to control and receive the rents and profits, if there be any, until the war between the Confederate States and the United States is over, and some of her children comes and sees to the payment of the board, unless it shall be sooner paid. If the said A. J. Wells should receive any rents or profits for the house and lot, he is to give me credit with the amount on my account with him for board; and he will also give me credit with the amount of sale-bill bought at Mrs. Watrous' sale, amounting to $672. Given under my hand and seal, this 18th March, 1865." (Signed by Mrs. Watrous, attested by said Nabors, and filed for record on the 19th October, 1865). Said Nabors having testified to the execution and

[Wells v. Sheerer.]

delivery of this instrument, the court admitted it as evidence, against the objection of the defendants; to which ruling they reserved an exception. Said Nabors further testified, that A. J. Wells went into the possession of the house and lot on the delivery of this instrument, "and held possession under said instrument;" that Mrs. Watrous removed to Texas soon afterwards, and never returned to Alabama; that said Wells continued in the uninterrupted possession of the house and lot until his death, and his widow and children afterwards continued in possession; and he further testified to the rental value of the property. The defendants then introduced witnesses who testified to the continued possession of the premises by said A. J. Wells up to the time of his death, paying the taxes, selling a part of the property, and exercising other acts of ownership, openly and notoriously; and to the possession of the defendants after his death, also exercising acts of ownership. They also introduced evidence as to the condition of the property, as to its rental value, and as to the amount of rents actually received. "The defendants then offered to show by witnesses that plaintiff's said ancestor, Mrs. Watrous, was indebted to said A. J. Wells in a large amount, for board and lodging three years and a half up to 1865;" and they excepted to the rejection of this evidence by the court.

The court charged the jury, on request of the plaintiff, as follows: (1) "If the jury believe, from the evidence, that A. J. Wells took possession of the property under Mrs. Watrous, plaintiff's ancestor, with the understanding that he was to keep and control said property for her benefit—that is, to pay out of her rents a debt due by her to him—then neither said Wells nor his heirs can set up adverse possession in this action, unless they show that a knowledge of such adverse claim was brought to the knowledge of plaintiff or her ancestor." (2) "The notice of this adverse holding must be shown by the evidence to have been brought to the knowledge of Mrs. Watrous or plaintiff." The defendants excepted to each of these charges, and they now assign them as error, together with the sustaining of the demurrer to their special plea, and the rulings on the evidence to which they reserved exceptions.

RICE & WILEY, for the appellants.

COBB & WILSON, contra.

SOMERVILLE, J.—The action, which is one of ejectment under the statute, can be sustained only in the event of the plaintiff's being entitled to enter and take actual possession of

the premises which are the subject of controversy, and such right must have existed at the commencement of the suit.

The nature of the defendants' possession, and the character of their title, was of material importance in determining this question. To show this, it was clearly permissible to introduce in evidence the written instrument executed on the 18th of March, 1865, by Maria Watrous to A. J. Wells, relating to this land; the plaintiff claiming as the sole heir of the former, and the defendants as heirs of the latter, and both parties litigant therefore deriving title from, if not claiming through the same person, Mrs. Watrous. The effect of this instrument was to show that the title of Wells, and of those claiming under him, was originally subordinate and permissive—a fact which bears most materially on the issues arising under the defense of the statute of limitations, and the alleged adverse possession of the defendants and their ancestor.

The instrument itself is somewhat complex in its character. It appears, in one aspect, to have been intended as an informal mortgage of the rents and profits, being declared to be given as "collateral security" for a specified debt; bearing some analogy to a " Welsh mortgage," though essentially different from such an instrument in many particulars. In another aspect, it is impressed with the features of an express trust by which an agency has been created, coupled with an interest in the property which is the subject of the agency, with the power to manage for the joint benefit of both parties. But, with these multiform features, it, perhaps, bears a more striking similitude, in legal effect, to a lease, though having no operative words of grant or demise. The owner of the premises, having voluntarily by written agreement dispossessed himself, vests in another the right of possession to the premises, with power to control them, and to collect the rents, and appropriate them to the payment of a debt admitted to be due the occupant; and this right is to continue until the debt is paid. We incline to the view, that the agreement may be treated as analogous to a lease, and for the purposes of this decision we regard it in this aspect.

The main defense urged in the case is, that the action is barred by the statute of limitations, by reason of the adverse claim of title to the premises by A. J. Wells, the *quasi* lessee, and the defendants who hold under him. In support of this defense it is shown that, after Wells had entered into the permissive occupation of the house and lot under Mrs. Watrous, in March, 1865, and after her departure for Texas, where she died in the year 1880, he disclaimed her title to the property, and set up an adverse claim in himself, which is asserted to have been continuous, open, and notorious. There is no doubt
10

of the rule, that a tenant is estopped from denying the title of his landlord, so long as the relation exists and is recognized between them. But the tenant may repudiate the relationship, and set up an adverse claim and possession in himself, which, when properly brought home, whether expressly or by implication, to the knowledge of the landlord, will put in operation the statute of limitations in the tenant's favor.

But the rule of the common law is, that whenever a tenant undertakes to disavow the relationship in this manner, by a hostile claim of ownership in himself—such a claim, at least, as would mature into a good title under the operation of the statute of limitations, if not redressed by action—this repudiation of the loyalty of his obligations will operate as a forfeiture of the lease, at the election of the landlord, who may proceed to consider the tenant as a stranger and a trespasser, and eject him accordingly.— *Willison v. Watkins*, 3 Pet. 43 ; *Newman v. Rutter*, 8 Watts, 51 ; *Jackson v. Vincent*, 4 Wend. 633 ; *Duke v. Harper* (6 Yerg. 230), 27 Amer. Dec. 462. If the rule were otherwise, landlords would be without remedy, in cases where tenants should arrogate to themselves hostile claims of ownership to the rented premises. · This principle is modified only *pro tanto* by our statutes. Section 2196 of the Code (1876) provides, that "*a conveyance* made by a tenant for life *or years*, purporting to convey a greater interest than he possesses, or can lawfully convey, does not work a forfeiture of his estate, but passes to the grantee all the estate which the tenant could lawfully convey." The effect of this statute is to take out of the operation of the rule of forfeiture mere conveyances under which a hostile title may be asserted. It has no reference to any other mode by which an adverse possession may be set up. The distinction is of importance, in view of its bearing on the statute of limitations.—*Pickett v. Pope*, 74 Ala. 122 ; *Smith v. Cooper*, 59 Ala. 494.

In view of this principle, the court properly ruled out the evidence tending to show an indebtedness from Mrs. Watrous to A. J. Wells. If the latter had held under the lease, this evidence would have been clearly competent. But, as he had repudiated it, he can claim no benefit under it. Conceding that the special plea, to which a demurrer was sustained, could be filed in connection with the general issue, the action of the court in sustaining the demurrer may be justified for a like reason.

The court did not err in charging the jury that, before the adverse possession of the defendants could avail as a bar to this action, such fact must have been brought to the knowledge of the plaintiff, or of her intestate ancestor. The father of defendants entered the premises in recognition of the title of

[Mobile Life Insurance Co. v. Teague.]

Mrs. Watrous, and, holding under her permissively, his title and possession was hers. As said by this court in *Lucas v. Daniels*, 34 Ala. 188, 193, "the whole doctrine of adverse possession rests upon the presumed acquiescence of the party against whom it is held, and there can be no acquiescence without knowledge." It is true that this knowledge need not be actual, or such as would be imputed by express notice, even in the case of an adverse possession asserted by a tenant against a landlord; and the charge does not so assert. It may be a knowledge imputed impliedly by collateral facts, of such a nature as to cast on the party the legal duty of not being willfully or negligently ignorant of all proper inferences to be drawn from such facts. This is *implied* notice, which, strictly speaking, differs from *constructive* notice in being a matter of fact rather than of law; the latter species of notice being defined to be a knowledge often conclusively imputed by the court, on presumption that the information must have been communicated.—2 Bouv. Dict., tit. *Notice*; Story's Eq. Jur. § 399. The rule is stated in varied phraseology in the text-books and numerous adjudged cases—the underlying principle, however, being that notice, whether express, implied, or constructive, is but a mode or means of imputing knowledge, actually, impliedly, or legally; and knowledge is but information imputed by notice in one of these several modes. The term does not necessarily imply that the mind must be cognizant of the main fact.—*May v. Chapman*, 16 M. & W. 361; 2 Abbott's Law Dict., tit. *Notice*; *Alexander v. Wheeler*, 69 Ala. 333; *Collins v. Johnson*, 57 Ala. 304; *Fielder v. Childs*, 73 Ala. 567; *Duke v. Harper*, 27 Amer. Dec. 462; Wood on Lim. §§ 212, 213; Angell on Lim. § 444; *Lucas v. Daniels*, 34 Ala. 188; Wade on Notice, § 11.

We find no error in the record, and the judgment is affirmed.